Following trial, a judge of the Juvenile Court issued decrees terminating the father's and mother's parental rights to their son, Emmett. See G. L. c. 119, § 26 ; G. L. c. 210, § 3. Both parents appeal. The father challenges the determination of his unfitness, claiming the judge erred in finding that he failed to engage in substance abuse treatment, failed to participate in a batterer's intervention program, had unstable housing, and wilfully refused to visit the child for several months. The mother concedes her unfitness but asserts that the judge abused her discretion in failing to order posttermination and postadoption visitation. We affirm.
Discussion. 1. Father's unfitness. The "critical question" is whether the father is "currently fit to further the welfare and best interests of the child." Bezio v. Patenaude, 381 Mass. 563, 576 (1980). The Department of Children and Families (DCF) must prove parental unfitness by clear and convincing evidence. Care & Protection of Laura, 414 Mass. 788, 793 (1993). A parent's past conduct has prognostic value, and a judge may "properly consider past parental conduct as relevant to the issue of current parental fitness where that conduct [is] not too remote, especially where the evidence support[s] the continuing vitality of such conduct." Adoption of Larry, 434 Mass. 456, 469 (2001). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). Here, the judge based her finding that the "[f]ather ha[s] [a] lengthy substance abuse histor[y], as well as a lengthy history of noncompliance with [DCF]" on several factors, including the father's past and present conduct. The judge found that the father's substance use began at the age of fifteen, and that his drug use escalated well into his adulthood, resulting in a lengthy arrest record for various drug-related offenses. The judge also found that as recently as 2014, the father's substance abuse was partially to blame for the termination of the father's parental rights to several children not at issue here.[3] However, despite this history of substance abuse, which the father and mother share, the father refused to accept that the mother was using drugs during her pregnancy with the child and, more significantly, the father denied the effect of the mother's drug use on the child. The father became belligerent and had to be removed from the hospital when the child, who was born with marijuana and amphetamines in his system, was moved to the nursery unit where he could be monitored for drug withdrawal symptoms. See Adoption of Katharine, 42 Mass. App. Ct. 25, 32-34 (1997) (to support termination of parental rights, substance abuse must lead to physical or emotional neglect of child). Against medical advice, the mother then signed herself out of the hospital and left with the father. DCF assumed emergency custody of the child.
The father's denial of any substance abuse problem persisted even after DCF took custody of the child. He refused to participate in a substance abuse treatment program or, at the very least, submit to a substance abuse evaluation and drug testing. In support of his position that he no longer used any drug other than marijuana, the father points to letters he submitted documenting his participation in "Clean Slate." However, the judge found "ample evidence to suggest that these letters were fabricated," and she did not credit the father's submissions.
In any event, even if credited, these letters do not establish the father's successful completion of a treatment program but, rather, simply the father's attendance at a program for a fleeting one and one-half to two months. Accordingly, the judge properly "dr[e]w a negative inference" from the father's largely unexplained refusal to cooperate with DCF, Care & Protection of Vieri, 92 Mass. App. Ct. 402, 406 (2017), and she gave proper prognostic value to the father's history of an untreated substance abuse problem that contributed to his current unfitness. See Adoption of Jacques, 82 Mass. App. Ct. 601, 607 (2012).
The father also challenges the judge's consideration of his refusal to participate in a batterer's intervention program. According to the father, he did not require such a program, as there was no evidence that he physically abused the mother. However, the father fails to account for the overwhelming evidence of emotional abuse.
The father had a history of abusing the mother that dated back to 1999, and the father's abuse and control of the mother persisted to the time of trial. In the presence of DCF staff, the father displayed "controlling" behavior toward the mother and did not let her speak for herself. He also acted aggressively toward DCF personnel and hospital staff. Moreover, prior to trial, the father publically humiliated the mother on Facebook, and he changed the mother's cellular telephone voice mail greeting to say, "You've reached [Mother's first name] stink pussy [Mother's last name]. I'm getting paid by [Kevin (a pseudonym) ] because he makes me prostitute for him." The father's emotional abuse also carried through to his children. He once published an offensive Facebook message, directed at his eldest child (who is not at issue here), in which he stated, "I'm no longer your father your [sic ] dead to me You know get my last name off yours you are not my child so don't go by my last name ... I'm done with you and when [Emmett] comes home you won't see him again." Given this history of emotionally abusive and aggressive behavior, we discern no error in the judge's finding.
Finally, the father contends that the judge committed clear error in finding that the father had unstable housing and "wilfully" refused to visit the child at DCF's offices in Malden while the child was in DCF custody.
As to the first of these challenges, the father mistakenly claims that the judge found the father's housing unstable. The judge did not discount the father's steady residence at the same hotel, but rather, the judge considered the father's refusal to permit DCF to inspect the accommodations for safety and suitability for the child. Given the father's and mother's history of substance abuse and the mother's use of the housing for prostitution purposes (which had once resulted in a robbery of her at knifepoint), there was cause for inspection of the premises. Where the father refused to permit such inspection, the judge did not err in considering the unsuitability of the father's housing. Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008) (parent's "inability to secure adequate stable housing was ... properly considered in determining [his] unfitness" [quotation omitted] ).
We are also satisfied that the judge's finding that the father wilfully refused to visit with the child is amply supported in the record. The child was born in October, 2014, and the parents visited the child at the DCF offices in Malden in November, 2014, but canceled the December visit without advance notice and without any attempt at rescheduling. The father later complained that the visits to Malden would "risk [his] job" and that he did not want to "spend [his] money" on transportation; visits resumed when they were transferred to a location in Braintree. Even then, however, the father complained about the financial inconvenience. In addition, while the father insists that he cannot be faulted for failing to have the means to visit the child from December to March, the judge considered that the parents also disingenuously blamed the lack of visits on that winter's extreme weather conditions. These heavy snow storms did not commence until late January, 2015, and did not explain the other failed visits. Accordingly, the judge's finding that the failure to visit was wilful was not clearly erroneous. See Adoption of Helen, 429 Mass. 856, 859-860 (1999) (judge may properly consider a parent's failure to make scheduled visits with a child in DCF custody when determining unfitness); G. L. c. 210, § 3(c )(x) ("willful failure to visit the child where the child is not in the custody of the parent" is factor judge must consider when determining parental unfitness).
2. Posttermination and postadoption visitation. The mother asserts that the judge abused her discretion in refusing to order posttermination and postadoption visitation. We disagree. A posttermination and postadoption visitation order is appropriate only when visitation is in the best interests of the child and such order is necessary to protect those interests. Adoption of Ilona, 459 Mass. at 63-64. In making this determination, the judge should consider the particular needs of the child, including whether the child has "'a significant, existing bond with the biological parent' whose rights have been terminated," and whether he has a bond with the preadoptive family. Ibid., quoting from Adoption of Vito, 431 Mass. 550, 563 (2000). The mother, who had only intermittent contact with the child after his birth, did not foster the kind of bond with the child that would require an order of visitation, and the question of visitation could be left to the discretion of the preadoptive family, with whom the child has resided since his removal. See Adoption of Ilona, supra at 63. Accordingly, we see no abuse of the judge's wide discretion in denying the mother's request for an order of visitation.
Decrees affirmed.

The mother's parental rights to these children were also terminated.